**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **MAG. NO. 20-61 (DAR)** |
| | : | |
| **DAMION JOHNSON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that the defendant be detained pending trial pursuant to 18 U.S.C. § 3142 (f)(1)(E) and 18 U.S.C. § 3142 (d)(1)(A)(iii) of the federal bail statute.   The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

**I.   Procedural History**

The defendant is charged by criminal complaint with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of Title 18 U.S.C. § 922(g)(1). At today's initial appearance, the government intends to orally move for detention pending trial pursuant to the above-referenced provisions of the federal bail statute, and any additional provisions that may apply upon review of the Pretrial Services Agency report.   Upon agreement with the defense and in light of the current national public health emergency related to COVID-19, the government intends to immediately proceed to the detention hearing.

## II.   Legal Authority and Argument

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).   Specifically, the presentation of hearsay evidence is permitted.   Id.; United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996).   Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."   United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986); United States v. Williams, 798 F. Supp. 34, 36 (D.D.C. 1992).   A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery.   Smith, 79 F.3d at 1210, see also Williams, 798 F. Supp. at 36.

There are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.   See 18 U.S.C. § 3142(g).   A review and understanding of the facts and circumstances in this case require the Court to conclude that there is no condition or combination of conditions that would assure the safety of the community. See 18 U.S.C. § 3142(e)(1).

### A.   Nature and Circumstances of the Offenses Charged

On Saturday, April 11, 2020, at approximately 3:15 p.m., members of the Metropolitan Police Department (MPD) Narcotics and Special Investigations Division (NSID) Narcotics Enforcement Unit (NEU) were patrolling and conducting operations in the area of Benning Road

Northeast and East Capitol Street Northeast in Washington D.C. An undercover officer observed a Nissan Sentra sedan with Virginia hard tags of UMW1644 in the area. The undercover officer requested that officers nearby run a WALES/NCIC query of the vehicle. That inquiry revealed that the Virginia hard tags belonged to a Toyota, not the Nissan it was affixed to. MPD officers conducted a traffic stop on the Nissan in the 2000 block of C Street Northeast.

The driver, later identified as the defendant Damion Johnson and the passenger, who was identified on scene, were stepped out of the vehicle. The Vehicle Identification Number of the Nissan was run in WALES/NCIC and revealed that the vehicle was stolen out of Prince George's County Maryland. The defendants was placed under arrest for Misuse of Tags and Unauthorized Use of a Vehicle.

A search incident to the arrest of the defendant revealed a firearm in the defendant's groin area. Before retrieval, the defendant verbally confirmed that the item in his groin was a firearm. The defendant helped officers remove the firearm from his person safely and the defendant was transported to the Fifth District police station for processing. Federal Bureau of Investigation Special Agent Farrar read the defendant his *Miranda* Rights, which he waived. The defendant then admitted to possessing the handgun. Specifically, the defendant stated that he purchased the firearm within the last week for protection.

The firearm that was recovered from the defendant's groin area was determined to be a Glock, model 19, .9 millimeter semiautomatic handgun with a serial number of FB049.  When it was recovered, it was loaded with one (1) round in the chamber and thirteen (13) rounds in a fifteen (15) round capacity magazine.

B.      **Weight of the Evidence Against the Defendant**

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention.  The evidence against the defendant is quiet strong.  The subject firearm was recovered directly from the defendant's person in a search incident to his arrest involving his operation of a stolen vehicle.  The firearm was loaded with one (1) round in the chamber and thirteen (13) rounds in the magazine. Additionally, after waiving his *Miranda* Rights, the defendant admitted to possessing the handgun during a video-taped custodial interview.

C.      **The Defendant's History and Characteristics**

The third factor, the history and characteristics of the person, similarly weigh in favor of detention.  The defendant's criminal conduct has remained undeterred as evidenced by the defendant being on supervision in two matters involving his possession of a firearm, at the time of the charged offense. The defendant has the following prior convictions:

- Carrying a Pistol Without a License (Washington, D.C., 2019)
- Armed Robbery (Maryland, 2015)

The government submits that the defendant should not be released.

D.      **Danger to the Community**

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, also weighs in favor of detention.  At the time of the charged offense, the defendant was (and remains) on supervised probation in D.C. Superior Court Case Number 2018 CF3 16212, with charges of Carrying a Pistol Without a License.  At the time of the D.C. Superior Court offense, the defendant was on supervision in Maryland Case Number CT141300B, with charges of Armed Robbery. Now again, while on supervision in the D.C.

4

Superior Court case, the defendant has incurred a new arrest.

The defendant's supervision in his Maryland case terminated unsatisfactorily on July 15, 2019.  The defendant's compliance in his Superior Court matter, which is active at the intensive level, has been lacking. Specifically, the defendant is on supervision in the case from August 8, 2019 through August 7, 2020. According to the defendant's supervising officer, the defendant has attended individual counseling, and has reported for supervision.  However, the defendant has tested positive for opiates (without a prescription). Notably, the defendant has tested positive for opiates six (6) times, with the last time being on March 18, 2020, and failed to report for testing an additional five (5) times, with the last time being on March 9, 2020. For these reasons, the government submits that the Court should order the defendant's detention during the pendency of this case to protect the community.

## E.    COVID-19 REPRESENTATIONS

The government anticipates that the defendant will also request release because of the COVID-19 Coronavirus (COVID-19) that is currently affecting the nation. The government believes that the defendant will argue that the D.C. jail is ill-equipped to handle the pandemic. The U.S. Attorney's Office has been in consultation with the DOC in light of the rapidly-changing situation. Based upon the information provided to the government at present, it appears that DOC is handling the situation as well as it can – no different than any organization in the United States that is trying to weather this pandemic. Unless and until that changes, the government cannot endorse wholesale release of dangerous defendants.[1]

---

[1] The government is aware of reports from local unions and the Fraternal Order of Police that DOC is derelict of its duties to its employees. *See* March 29, 2020 Press Release from Fraternal Order of Police Department of Corrections Labor Committee (describing DOC's failures to follow CDC guidance). On March 30, 2020, the ALCU and D.C. Public Defender Service sued DOC for what it claims are violations of the Fifth and Eighth Amendments. That case

As set forth in more detail below, DOC is taking precautionary steps to address this problem, and any assertion that DOC is failing to take remedial action is without merit. Specifically, as of March 27, 2020, according to the DC-DOC, it has done the following to ensure the safety of its incarcerated population:

- banned all non-attorney visits to limit unnecessary exposure;

- implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms, sanitizing stations, etc.;

- if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days;

- DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus;

- DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.;

- DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control;

- DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations;

- DOC checks and rechecks its ventilation system to ensure the air quality in the facilities;

- DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses

---

is assigned to Judge Colleen Kollar-Kotelly and is stylized as 20-cv-849 (CKK).

While the government takes seriously allegations that the pandemic has confronted DOC with an unprecedented institutional challenge, we have been unable to independently verify these claims. We will continue to update the Court of all information – positive or negative – as the information is made available to the U.S. Attorney's Office.

weekly to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours;

- DOC would like to limit the number of inmates coming into its facility at any given time;[2] and

- upon information and belief, DOC has the capacity to quarantine near 100 inmates, although that number is fluid and subject to change.

See also Coronavirus Prevention, D.C. Department of Corrections (March 27, 2020), https://perma.cc/L59Z-WG43 (explaining how the DC-DOC has suspended in-person visitations, enhanced cleaning efforts, ordered additional sanitation supplies, and diminished out-of-cell recreational time in response to the threat of COVID-19).

On April 1, 2020, DOC responded in 20-cv-849 (CKK), and provided additional

---

2       Law enforcement partners have put in place procedures to reduce the number of individuals subject to custodial arrest, exercising their authority to issue citations for individuals to appear on a future dates. See e.g., Metropolitan Police Department Order EO-20-011, *Coronavirus 2019 Modification to Citation Release Criteria* (effective March 17, 2020) ("[T]he USAO and OAG have exercised their authority under DC Code § 23-584(c) to categorically approve the citation release of arrestees consistent with the following updated criteria during the COVID-19 emergency. . .."). Additionally, on March 27, 2020, with the consent of the U.S. Attorney's Office and others, the Chief Judge issued an order regarding the suspension of the execution of bench warrants in certain misdemeanor cases and an order suspending all sentencing provisions requiring service of sentence on weekends.

Additionally, the inmate populations at CDF (the D.C. Jail) and CTF appear to be well below the figures prior to the outbreak of the pandemic. According to a report issued by the Office of the District of Columbia Auditor on Feb. 28, 2019, which was attached as an exhibit to PDS's motion for a Temporary Restraining Order filed in Banks v. Booth, Case 1:20-cv-00849-CKK (D.D.C. Mar. 30, 2020), as of June 2018, the average daily populations at CDF and CTF were 1346 and 692, respectively. According to the DC-DOC census distributed to the Criminal Justice Coordinating Council (CJCC), the inmate populations as of February 29, 2020 (prior to the crisis) were 1242 at CDF and 540 at CTF, and on April 3, 2020 (following three weeks of measures in response to the crisis) were 1097 at CDF and 448 at CTF. In other words, the current jail populations at CDF and CTF are down approximately 18% and 35%, respectively, since the June 2018 average, and down approximately 11% and 17%, respectively, since the end of the month prior to the crisis. As of April 7, 2020, that number has decreased further, by appropriate fifty inmates.

information for the Court to consider, including all relevant written procedures and practices concerning COVID-19, particularly related to legal visits and communication. 20-cv-849, ECF No. 19.   Indeed, while reports of positive cases within the Correctional Treatment Facility (CTF) have increased, such reporting would also seem to support a conclusion that steps are being taken to protect the population currently incarcerated there. Specifically, on March 26, 2020, the government learned that DOC reported its first COVID-19 positive test at CTF to the courts. The inmate was immediately placed into isolation and monitored. DOC and the D.C. Department of Health also began to contact trace, to determine who, if any, had contact with the inmate. DOC has previously handled possible COVID-19 cases with similar procedures.[3]

As of April 10, 2020, the government learned that the total number of positive persons is 47 and all have been placed in quarantine.[4] All positive inmates are localized to the Correctional Treatment Facility (hereinafter "CTF") with the exception of one inmate who was taken to a local hospital for observation, and are being monitored pursuant to CDC guidelines.   Of that group, 8 persons have fully recovered.   Respectfully and sadly, this should come as no surprise to the Court or the parties.   The idea that the DC-DOC would emerge unscathed from a global pandemic is doubtful.   The real inquiry is the balance of interests.[5]

---

[3] For example, two weeks ago, a Deputy United States Marshal in D.C. Superior Court tested positive for COVID-19. As a result of this positive test, DOC followed its protocols outlined above. Every inmate who might have been exposed to the deputy was placed in quarantine. Of the quarantined inmates, a single inmate became symptomatic, and later tested negative for COVID-19. The remaining inmates nevertheless remained in quarantine to protect the remainder of DOC's population, until the quarantine was safely lifted.

[4] This number is likely to change as more tests are conducted. For reference, as of April 7, 2020, there are 1078 residents at DOC's Central Detention Facility, 418 residents at DOC's Correctional Treatment Facility and 22 residents in halfway houses.

[5] As this Court is likely aware through prior filings, the government has endeavored – on a case-by-case basis and as a result of the public health crisis currently pending – to permit temporary release pursuant to 18 U.S.C. § 3142(i) or 18 U.S.C. § 3145(c) to those who actually need release. For example, in United States v. Carl Courtney, 19-cr-413 (TJK), the government consented to release where the defendant had open wounds and was scheduled for surgery. In

In any event, there is nothing right now that suggests the defendant's particularized health necessitates his release. The defendant stands accused of a serious felony offense, while on supervision for another felony matter involving his possession of a firearm. This clearly speaks to his danger to the community. Moreover, the defendant has performed poorly on supervision in that prior case such that the United States Probation Office will be seeking a warrant for his arrest.

While several district courts have already opined on the COVID-19 pandemic, it is clear that the analysis ultimately boils down to the defendant's particular danger, even in cases involving vulnerable health conditions, and that any request for release must still be grounded in the factors set forth in 18 U.S.C. § 3142. *See United States v. Watkins*, 20-cr-19 (CRC) (D.D.C. March 31, 2020) (Minute Order) (highlighting the §3142 factors and noting that a "generalized risk to otherwise healthy detainees" is not alone sufficient, denying release in a gun case) and *United States v. Marchi*, 19-cr-406 (DLF) (D.D.C. April 2, 2020 Minute Order) ("[B]ased on the current record, neither the present pandemic nor the defendant's mild asthma is a new circumstance that warrants reconsideration" in a firearm case).   Opinions filed in neighboring districts are in accord.[6] On March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on this very issue. *United States v. Martin*, 2020 WL 1274857, *2

---

United States v. Larry Key, 19-cr-292 (JDB), the government consented to release due to the defendant's advanced age, his lung, heart, and kidney disease, and current multiple hospitalizations. The government is sincerely trying to balance the danger of the offender, the defendant's medical condition (if substantiated) and the pandemic, but cannot ignore a person's record, their conduct, or any alleged or unverified maladies.

[6] *But see United States v. Stephens*, 15-cr-95-AJN (S.D.N.Y. March 19, 2020) (COVID-19 outbreak as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.*

Notably, the Court recognized that its decision cannot be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).")

(D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court nevertheless recognized that "resolving . . . an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's proposed use of GPS location monitoring even if the defendant was released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (E.D. La. March 19, 2020) ("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community").

The government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant. Should circumstances change at the DOC, to the point that the defendant's health is actually in jeopardy, the defendant may request reconsideration. But at this stage and at this time, DOC appears dedicated and willing to address this public health crisis. Given the plans in place at the DOC and the danger that the defendant represents to the community – the same community also affected by this illness – the government respectfully requests that this Court grant the government's motion.

### III.   Conclusion

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

TIMOTHY J. SHEA
UNITED STATES ATTORNEY
D.C. Bar No. 437437

By:     /s/ Lisa N. Walters
Lisa N. Walters
D.C. Bar No. 974-492
Assistant United States Attorney
Violent Crime and Narcotics Trafficking Section
United States Attorney's Office for D.C.
555 Fourth Street, N.W., Fourth Floor
Washington, D.C. 20530
E-mail: Lisa.Walters@usdoj.gov
Telephone: (202) 252-7499

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel, Tony Miles, via electronic case filing (ECF), this 13th day of April, 2020.

     /s/ Lisa N. Walters
Lisa N. Walters
Assistant United States Attorney